

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
GREENBELT DIVISION

BRETT C. KIMBERLIN,
     Plaintiff,

    v.                       No.  24CV2.323

UNITED STATES DEPARTMENT OF JUSTICE,
ATTORNEY GENERAL MERRICK GARLAND,
UNITED STATES ATTORNEYS OFFICE FOR THE DISTRICT OF MARYLAND,
EREK BARRON,
UNITED STATES PAROLE COMMISSION,
LYNN BATTAGLIA,
TAMERA FINE,
RENATA RAMSBURG,
        Defendants.

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF FOR VIOLATION OF CONSTITUTIONAL AND PROCEDURAL RIGHTS**

Plaintiff Brett Kimberlin complains of Defendants United States Department of Justice, Attorney General Merrick Garland, United States Attorneys Office for the District of Maryland, Erek Barron, United States Parole Commission, Lynn Battaglia, Tamera Fine, and Renata Ramsburg for violations of Plaintiff's constitutional rights including to due process, equal protection, and freedom from cruel and unusual punishment. The Defendants engaged in a conspiracy to deprive Plaintiff of his due process rights and right to liberty, to subject him to cruel and unusual punishment and sexual assault, to coverup their misconduct, and to deprive him of his right to redress, with overt acts beginning in November 1996 and continuing to May 2024. This has been a continuing conspiracy that has covered 27 and a half years. This Complaint is brought to hold the defendants accountable for

corrupting justice, to deter future misconduct, to publicly expose their corruption, and to compensate Plaintiff for the monstrous and lawless wrongs committed against him by the Defendants.

## Narrative Of Relevant Facts

1. Political operatives used an administrative agency of the Executive Branch -- the Parole Commission -- to harass, audit and imprison Plaintiff simply because he exercised his First Amendment right to speech and political activity. Then, other Department of Justice officials lied to the federal courts in order to revoke his parole and cover up that misconduct. At no point during this conspiracy did a single official in a position of power take any action to stop or rectify the misconduct even though they were aware of it. Instead, key participants in this conspiracy, including Lynn Battaglia and Tamera Fine, used their misconduct as a stepping stone to enhance their careers.

## Background

2. Plaintiff was convicted in federal court for a 1978 intentional tort against Carl and Sandra Delong. The trial was very controversial because Plaintiff had alibis, six witnesses were hypnotized by the prosecution, and no evidence connecting him to the crimes was discovered at his homes. His first trial ended in a hung jury, nine to three for acquittal. Two years later, the Delongs sued him in Indiana state court for the injuries sustained therefrom. In March 1983, shortly before the trial was to begin, Carl Delong committed suicide after his wife filed for divorce.

3. In late summer 1983, the judge assigned to the civil case, Michael Dugan, approached Plaintiff's trial attorney, Nile Stanton, in an Indianapolis bar and solicited a $10,000 bribe from him to rule in Plaintiff's favor. In short, after the bribe was rebuffed, the judge allowed Mrs. Delong to add a wrongful death court on the day of the scheduled trial, and then summarily ruled against Plaintiff on all issues based solely on Plaintiff's wrongful conviction without even allowing him to attend the proceedings. Damages were awarded in the amount of 1.6 million dollars again without allowing him to appear, and the judge even refused to allow Plaintiff to appeal the judgment.

4. Plaintiff and his attorney reported the bribe to the United States Attorney's Office and cooperated with AUSA Larry Mackey, who was conducting a grand jury investigation into the judge's corrupt practices. In August 1988, Judge Dugan was indicted on 29 federal charges including racketeering, extortion, bribery, mail fraud, and tax evasion. He was found guilty by a jury and a sentencing report included mention of the bribe solicitation in Plaintiff's case. At sentencing, Plaintiff submitted a victim's statement, and the AUSA labeled Judge Dugan "the most prolifically corrupt judge in the entire Seventh Circuit." Judge Sarah Barker, when sentencing the judge, said that he had put a "For Sale" sign on his courtroom door and "called into question every decision he ever rendered." When Judge Dugan was first reviewed for parole in 1995, the Parole Commission asked Plaintiff to submit a victim's statement, and the Commission denied parole in part because the judge refused to admit to any crimes other than those for which he was convicted.

5. In July 1988, Plaintiff was reviewed by the Parole Commission and placed in the most severe offense category because of the "wrongful death" civil judgment. On administrative appeal of that finding, the Commission abandoned reliance on the wrongful death after learning of the corrupt judgment. The Commission eventually ordered that Plaintiff be released on parole on February 14, 1994.

6. Between 1988 and 1994, there was a great deal of media and political interest in Plaintiff, which eventually resulted in a book contract. In April 1993, while still in prison, Knopf Books signed a contract with author Mark Singer and BKE Inc. for a story about the life of Plaintiff. Under the contract, the book was supposed to be completed within 18 months with separate advance payments at different stages of the book writing. When Plaintiff was released from prison a year later, however, the writing had not even begun.

7. When Plaintiff was released from prison, the Parole Commission imposed many conditions of parole, none of which required that he pay the corrupt, Indiana civil judgment. The Commission approved him working on the book for the next three years. In July 1994, Mrs. Delong attempted to attach the proceeds of one of Plaintiff's civil suits but the federal judge, after learning of the corrupt judgment, refused the attachment. A few years earlier, another federal judge made a similar ruling.

8. When Plaintiff's parole officer, Thomas Koehler learned of the attempted attachment in the first suit above, he wrote to the Parole Commission and asked if

he could require Plaintiff to pay the civil judgment as a condition of his parole. The Commission responded that "civil judgments are not covered by parole condition 13." Mr. Koehler then informed Plaintiff that he did not have to pay the judgment. Plaintiff also provided a letter to Mr. Koehler from his lawyer in Indiana which stated that the statute of limitations had run on the corrupt civil judgment.

9.   After Judge Dugan was convicted, David Hamilton, now a federal judge in the Seventh Circuit, sought and received permission to file a belated appeal of the corrupt judgment but he could not raise the corruption issue on direct appeal. The Indiana Court of Appeals reversed but the Indiana Supreme Court, *sua sponte*, reinstated the judgment in early 1994. Plaintiff informed his parole officer about the decision.

10. Plaintiff became a model parolee and a successful businessman. He worked on the book, a music project, and started a new business in international trade with Ukraine. He traveled extensively, both domestically and abroad, and regularly dealt with top political and business leaders. He bought a home and got married to a Ukrainian. This success resulted in his parole supervision being reduced to "minimal" and several favorable press reports.

11. In May 1996, when applying for his home mortgage, Plaintiff told the mortgage company about the 14-year-old judgment from Indiana. The Vice President of the company advised Plaintiff that such an old judgment could not be used to deny a loan

and should not be put on the mortgage application. Plaintiff's parole officer approved the purchase of the home, and Plaintiff and his wife moved there in July 1996.

**The Secret Political Pressure**

12. The favorable press reports and the book publication caught the interest of James Wilson, a former DOJ attorney under Bob Barr, who made no secret of his dislike for President Clinton and his supporters. On September 26, 1996, during the presidential election campaign, Wilson wrote an editorial in the *Washington Times* entitled, "The Bomber who Helped Elect Bill Clinton," which argued, inaccurately, that Plaintiff's book deal, success, and international travel were facilitated by President Clinton as a payoff for Plaintiff's help in electing the president. Wilson hoped to create a scandal during the campaign to help defeat the President.

13. Within days after the publication of the above editorial, someone contacted Oliver North, who then appeared on Larry King Live to proclaim falsely that President Clinton had "pardoned" Plaintiff. A few days later, North telephoned Plaintiff and asked that he appear with James Wilson on North's syndicated radio program to discuss the alleged connections with President Clinton. Although Plaintiff declined the offer, he did listen to and tape-record the program. James Wilson stated that his friends in Congress were investigating Plaintiff's favorable treatment by the Parole Commission.

14. Less than a week later, Plaintiff's parole officer, Marrell Hardin, (who had bragged that he wished all of his parolees were as good as Plaintiff) telephoned

Plaintiff to tell him that, because of "calls from Congress," his minimal supervision was being increased to maximum and he was being assigned to a "special offender" parole officer.

15. At about the same time, Mike Hubbard, the Chief Investigator for the Senate Judiciary Committee and the "eyes and ears of Senator Orrin Hatch," called the Parole Commission to inquire about Plaintiff's parole supervision, international travel, and non-payment of the corrupt civil judgment. The General Counsel of the Parole Commission, Michael Stover, returned the call and told Hubbard that the Commission did not have jurisdiction over state civil cases. Sometime later, Hubbard demanded that the Commission send "draft legislation" to the Senate to amend the parole statute to require Plaintiff to pay the civil judgment.

16. Upon further review, the General Counsel decided that such new legislation directed only at Plaintiff would constitute "a bill of attainder and violate the ex post facto clause." However, he decided that the Commission could require payment through a new special condition of parole under the general parole condition statute, 18 U.S.C. § 4209. Stover called Hubbard and advised him that the Commission would conduct a complete legal and financial audit of Plaintiff, and impose a new special condition of parole requiring him to pay the civil judgment which it would enforce with a "summons or warrant." This order was given by the then-chairman of the Commission, Edward Reilly, a former Republican Kansas state senator who was sponsored by Bob Dole and appointed to the Commission by George Bush. He *sua*

*sponte* assigned himself to Plaintiff's case. Stover again called Hubbard to advise him of the Commission's decision.

## The Book Publication and Withholding of Payment

17. In October 1996, Plaintiff learned that the hardback book would be published on November 7th and that it would include some unfavorable information about him and others. On the advice of his entertainment attorney, Geoff Menin, Plaintiff and ten others who had cooperated with the author filed claims against Knopf Books for false light and breach of contract. Knopf, in turn, as allowed by the contract, withheld payment of the hardback advance.

## The Audit and New Special Condition

18. Defendant Renata Ramsburg was assigned as the special offender parole officer and she immediately began a terrifying audit of Plaintiff which included not only his own personal finances but also the finances of his Ukraine business, his sister's business, and even his mother's financial affairs. Ramsburg called Plaintiff at all hours and demanded documents within days, which caused strong objections from Plaintiff's partners and family. Ramsburg demanded to know about all of his international trips (which had been approved by other parole officers), and she refused to approve any other trips abroad. Ramsburg even demanded to know the immigration status of Plaintiff's wife, and she implied that his wife could be deported if he did not cooperate.

19. After three months of this harassment and abusive tactics, Ramsburg wrote to the Commission that Plaintiff was expecting payment of the book proceeds in the amount of $225,000. In fact, however, the only money due was $112,500 for the hardback publication. On February 10, 1997, the Commission, believing that the book proceeds were to be paid any day, issued an *ex parte* administrative decree ordering Plaintiff to give all of the remaining book money to Sandra Delong within 24 hours or go to jail. It justified that order with the inaccurate statement that Plaintiff had refused to pay the judgment when, in fact, his lawyer told him it was stale and his parole officer had told him that he did not have to pay it.

**Plaintiff's Objections and the Parole Revocation Charges**

20. Plaintiff immediately objected to the order on many grounds including that 1) the money belonged to a corporation which had other obligations, 2) Knopf still possessed the money and would not release it until all the claims were settled, 3) it would deprive Plaintiff of his salary, rental income, and business expenses, 4) the judgment was stale and corrupt, 5) his prior parole officer had told him that he did not have to pay it, 6), the civil judgment was issued by a corrupt judge and was based on a wrongful conviction, and 7) he was entitled to due process in the enforcement process. The Commission rejected all of these objections and the parole officer continued her audit. She demanded to know if Plaintiff had told the mortgage company in 1996 that he had an outstanding civil judgment.

21. When Plaintiff did not pay the book proceeds by March 13, 1997, Ramsburg initiated two parole revocation charges against him ·· 1) mortgage fraud for not telling the mortgage company about the judgment, and 2) failing to pay the book proceeds when demanded by the Commission. She also confiscated his passport "until he paid the money."

**The Parole Revocation Hearings**

22. Prior to the preliminary revocation hearing, Plaintiff, as allowed by 18 U.S.C. § 4214 (2)(B), requested the appointment of counsel to assist him due to his inability to retain his own attorney. He again requested counsel and filled out the proper forms. The hearing examiner, Cathy Kirby, called Mr. Stover at the Commission to ask what to do about the counsel issue but Stover told her to deny counsel and hold the hearing.

23. Examiner Kirby told Plaintiff that the hearing was a "wake-up call" to pressure him into releasing the book money to Mrs. Delong and, if he did so, the parole charges would be dropped. At the end of the hearing, she said that she was finding "no probable cause" on Charge 2 (failure to pay), but finding probable cause on Charge 1 (mortgage fraud). A week later, however, the Commission found probable cause on both charges but said that it would drop them if Plaintiff paid the book money within 30 days and released all the third-party claims against Knopf. Knopf refused to release any of the book money without a settlement of all the claims including the

Commission's claim, and the 11 claimants refused to release their claims unless they were compensated.

24. A few weeks before the final parole revocation hearing, Plaintiff again requested the appointment of counsel from the District Court. However, the Commission, through Defendant Fine, falsely told the court that Plaintiff had not requested counsel or filled out the CJA forms. At the final revocation hearing, Plaintiff again requested the assistance of counsel, but was again denied after the examiner, Raymond Essex, called Mr. Stover at the Commission and was told to deny the assistance of counsel.

25. After determining that the book money was not paid to Mrs. Delong and berating Plaintiff for usurping the Commission's jurisdiction by filing for bankruptcy, Essex found Plaintiff guilty of both charges and ordered him imprisoned for 24 months. However, he said that he would reduce the sentence if Plaintiff compensated Mrs. Delong. The Commission then ordered Plaintiff to cooperate with the bankruptcy trustee and to compensate Delong before being paroled.

**Plaintiff's Sister's Letters to Senator Hatch**

26. On September 10, 1998, Plaintiff's sister wrote a letter to Senator Hatch demanding that he take action against those responsible for the improper and illegal conduct to pressure the Parole Commission to target Plaintiff. On January 14, 1999, she received a call from Michael Kennedy, Counsel for the Senate Judiciary

Committee, who told her that the initial calls to the Commission from Mike Hubbard were unauthorized and improper. He told her in subsequent conversations that Senator Hatch was troubled by the actions of his "former" staffer and would be taking formal action in the matter in the near future.

**The Bankruptcy Case**

27. Plaintiff listed the Knopf funds on his bankruptcy schedules. In July 1997, the Bankruptcy Court ruled against the Commission's motion to dismiss, holding that the case was filed in good faith and was not a collusive ploy. Defendant Fine issued a letter written in August 1997 to transfer Plaintiff from prison to the federal courthouse in Greenbelt, Maryland for a creditors meeting under 11 U.S.C. § 341. Plaintiff had requested that the meeting be conducted by telephone because none of the creditors planned to appear. When he arrived at the meeting, Defendant Fine began a long and threatening interrogation of Plaintiff which far exceeded the scope of any creditors meeting. Finally, because 11 U.S.C. § 343 does not allow questioning by anyone but the trustee and the creditors, the trustee interrupted the Defendant Fine and told her that she did not have the authority to ask questions. Defendant Fine's interrogation clearly violated the statute and Plaintiff's Fifth Amendment rights.

28. At the meeting, Plaintiff presented a settlement offer from Mrs. Delong for a $60,000 cash payment to settle her claim against Knopf and in bankruptcy. To accomplish this, Plaintiff's family agreed to co-sign a second mortgage on his home as

long as Plaintiff could work to pay off the loan. Defendant Fine, however, falsely told the Commission that no settlement existed and therefore the Commission refused to release Plaintiff to accomplish the settlement. Had the Commission agreed to the settlement, the bankruptcy case could have been quickly settled with Knopf and all of his creditors.

29. In October 1997, Plaintiff's entertainment attorney persuaded Knopf to pay the $60,000 as part of a Chapter 11 reorganization plan, and all other parties agreed. In the first of two court-approved settlements, the parties agreed that once Delong received her money, no special condition of parole would remain that Plaintiff pay the judgment outside of bankruptcy and that he would retain all of his civil defenses under state law. Knopf, however, refused to release the funds until a second settlement with all the claimants was also approved by the Bankruptcy Court. That settlement was approved on May 14, 1998, and the trustee received a $106,000 check from Knopf on June 16, 1998, to fund the Chapter 11 plan.

30. On that same day, the Parole Commission held a hearing and the examiner told Plaintiff that he could be released six months early after the trustee submitted a letter that Plaintiff cooperated in the bankruptcy case. On July 1, 1998, the Commission issued a new order memorializing that decision which also included a special condition that he continue to pay the Delong judgment as a condition of parole.

31. Defendant Fine then objected to Plaintiff's reorganization plan because it did not include future payments to Delong. Plaintiff was required to modify his plan to appease her. The trustee and the other two attorneys involved in the case wrote letters to the Commission regarding Plaintiff's cooperation and good faith. However, the Commission refused to reduce his sentence as promised.

32. The Bankruptcy Judge, on June 26, 1998, held a hearing and asked Defendant Fine to "un-revoke" Plaintiff's parole because he had complied with all of the Commission's demands. She refused. At another hearing on August 19, 1998, the Court blasted Defendant Fine for the Commission's "moving targets," capricious actions, and order depriving Plaintiff of self-employment. However, the Court, on December 15, 1998, reluctantly approved the plan with all the Commission's objections.

**Defendant Fine's Revenge**

33. In the fall of 1997, Defendant Fine filed a brief with the Fourth Circuit Court of Appeals which falsely stated that Plaintiff "never" submitted a CJA form requesting the appointment of counsel in his revocation proceeding. Plaintiff then filed for sanctions against her with the Court, OPR, and Maryland State Bar Disciplinary Committee. Defendant Fine responded by sending two U.S. Marshals to the federal correctional institution to interrogate and intimidate Plaintiff for filing those complaints. She also filed a perjurious declaration from parole examiner Cathy

Kirby stating that Plaintiff had not submitted the CJA form and she had not found any probable cause on Charge 2.

34. At a hearing on November 4, 1998, Defendant Fine brought Plaintiff's mother to tears with her vindictive comment that Plaintiff might never be paroled. In the hallway, the Defendant Fine purposely told Plaintiff's mother that he might serve 30 more years in prison.

35. On December 3, 1998, Defendant Fine falsely told the Commission that Plaintiff had acted in bad faith in the bankruptcy case by not accounting for all of his past income and concealing $225,000 in net income from the trustee. Based on that false information and a letter from Defendant Battaglia, the Commission issued an order for a "reconsideration" hearing and informed the Bureau of Prisons to cancel Plaintiff's release to the halfway house scheduled for December 28, 1998. The letter, written by Defendant Fine and signed by Defendant Battaglia, included a three-inch stack of pleadings he had filed in various proceedings. In short, it accused Plaintiff of bad faith in the bankruptcy case and Fourth Circuit because he filed pleadings challenging the Commission's actions and Defendant Fine's misconduct. The report repeated falsehoods that 1) no $60,000 settlement was offered at the creditor's meeting, 2) the bankruptcy case was a collusive ploy, 3) Plaintiff never filed a CJA form requesting counsel, and 4) Plaintiff lied to the trustee about the amount of available Knopf funds.

36. Upon receiving the report, Plaintiff wrote to Defendant Battaglia and asked her to withdraw the report because it was inaccurate. Also, his entertainment attorney wrote to the Commission and contested the report. Defendant Fine, however, responded, just days before the reconsideration hearing, with a "confidential declaration" to the Commission in which she, under oath, falsely accused Plaintiff of bankruptcy fraud by withholding information from the trustee about the amount of money due from the Knopf contract.

37. Plaintiff immediately contacted the trustee and entertainment attorneys, who agreed to fax the Commission documents showing that Plaintiff had fully disclosed everything to the trustee who approved all payments under the two court-approved settlements. At the reconsideration hearing, the examiner, Mrs. Pinner, after reviewing the faxed documents, found that Plaintiff did not withhold any information from the trustee about the Knopf funds, but she berated Plaintiff for filing for sanctions against Defendant Fine. (All the parole hearings were tape recorded). Then, rather than issue a decision at the end of the hearing as required by parole regulations, the examiner stated that she wanted to confirm the information with the trustee the following day, and would then render a decision. However, she never contacted the trustee. The Bureau of Prisons, believing that Plaintiff's release was imminent, again scheduled his release to the halfway house for February 26, 1999.

38. After 21 days, the Parole Commission issued a new decision finding that Plaintiff committed "bankruptcy fraud." The Commission imposed an additional 24-

month sentence for that "crime." The decision was based on an *ex parte* conversation between Defendant Fine and Parole Commission General Counsel Stover in which Fine said that the trustee did not have the authority to enter into the two settlements because the Knopf claimants, whom she labeled as "creditors," should not have gotten "preferential" treatment. The Bureau of Prisons immediately canceled Plaintiff's release to the halfway house.

39. Upon learning of the Commission's decision, both the trustee and the entertainment attorney informed the Commission that Plaintiff did not commit any fraud, that the trustee had the authority to approve the settlements, and that the Bankruptcy Judge properly approved the settlements and the Chapter 11 plan.

**The Mortgage Fraud Charge**

40. The Commission used the mortgage fraud charges as a pretext to pressure Plaintiff into paying the judgment even though it was corrupt, predicated on a wrongful conviction, and past the Maryland 12-year statute of limitations. Even after the Commission was informed by the Vice President of the mortgage company that Plaintiff told him about the judgment and he told Plaintiff not to list it on the mortgage application because it was not listed on any credit reports, the Commission found that Plaintiff committed the new "crime" of mortgage fraud. It was that criminal conduct that resulted in the initial 24-month revocation sentence against Plaintiff.

41. Finally, Plaintiff sent the mortgage company Vice President all of the Commission's findings on the mortgage fraud charge, and, on April 5, 1999, he wrote to the Commission asking that it reopen the fraud finding because everything it relied on was "inaccurate," and that the parole officer, Defendant Ramsburg, had provided false information to the Commission.

42. Despite all of the foregoing misconduct, Plaintiff was imprisoned for four years based on crimes that never occurred, using Plaintiff's wrongful conviction and a corrupt civil judgment as the basis for the parole revocation. Despite being a perfect parolee for years, Plaintiff was forced to serve the parole revocation at the medium security prison at Petersburg, Virginia. While there, he was subjected by prison staff to repeated unwanted, nonconsensual strip searches, which included demeaning and humiliating fondling by prison guards, rectal digital insertions, and being left naked for extended periods of time. He was placed naked in "dry cells" in order to secure urine for drug tests, but this was a pretext to sexually assault and humiliate him. Plaintiff suffered from bashful bladder from earlier childhood sexual assaults which were documented in his prison file making it easy for perverse guards to force him to strip naked and sexually assault him. On one occasion, he was forcibly removed from his cell and taken to solitary confinement where he was threatened by prison guards and the prison investigator to falsely implicate his unit manager in the sexual abuse of Plaintiff or never get out of prison alive. Plaintiff refused and was left naked in the solitary cell while prison guards leered at and taunted him. Plaintiff had no recourse

and feared retaliation if he objected to the perverse conduct. Plaintiff suppressed his emotions out of fear and as a matter of survival. All of this sexual abuse left Plaintiff emotionally distressed and he still suffers PTSD from the memories.

43. The 2005 OIG report on Sexual Abuse of Federal Inmates documented hundreds of cases where prison employees sexually assaulted federal inmates, including during the time Plaintiff was imprisoned. https://oig.justice.gov/sites/default/files/archive/special/0504/index.htm Federal and state laws allow civil rights suits to compensate a victim of sexual abuse.

44. Indiana civil code 34-11-2-12 states:. "Every judgment and decree of any court of record of the United States, of Indiana, or of any other state shall be considered satisfied after the expiration of twenty (20) years." In Plaintiff's case, the Indiana civil court issued an order of "satisfaction" after 20 years but the Defendant Parole Commission continued to force Plaintiff to pay that judgment after he was released on parole under threat of revocation if he did not.

45. The actions of the Defendants amounted to psychological torture of Plaintiff by accusing him of crimes that never occurred, and the Defendant Parole Commission at the behest of Defendant Fine repeatedly moved the goal post whenever Plaintiff complied. Defendant Fine grossly abused her authority, overstepped her bounds, and completely lost her objectivity causing her to personally retaliate and punish Plaintiff. She repeatedly lied to the Courts and the Parole Commission, and she continually interfered with the Court approved Chapter 11 bankruptcy proceeding. Yet she was never held accountable by anyone in the Department of Justice but

instead was allowed to keep her job and receive promotions. Defendant Battaglia who enabled Defendant Fine's misconduct and wrote the letter to the Parole Commission making false statements about a nonexistent bankruptcy fraud, parlayed her misconduct into an appointment as a Maryland State Judge without disclosing that she had railroaded Plaintiff with her lies.

46. Plaintiff has written numerous letters to the Department of Justice, Defendant Garland, the Inspector General, the Office of Professional Responsibility, Defendant Erek Barron, and Defendant Battaglia seeking redress for the gross abuses set forth in this Complaint and Plaintiff's wrongful conviction. He even requested a personal meeting with Defendant Barron but received no response. In fact, he has not received a single response on the merits from any official to any letter he has written about any of the Defendants.

47. The actions of the Defendants to imprison Plaintiff and destroy his life were based on factors other than bogus mortgage fraud and bankruptcy fraud charges. Indeed, these were merely trumped-up charges used to punish him for exercising his First Amendment rights to speech and redress. They were initiated at the behest of political opponents of Plaintiff and a Democratic president in retaliation for Plaintiff's speech and political activity. Clearly, it was only because of Plaintiff's parole status and the improper pressure from Republican political operatives that this nightmare was able to be perpetrated against Plaintiff and his family. Plaintiff did nothing but simply participate in the writing of a book. However, he lost his liberty, job, business,

reputation, credit, home, car, music contract and happiness. He missed his sister's wedding, his mother's hospitalization, and his wife was stranded in Ukraine. The Knopf claimants were forced to settle their legal claims for much less than expected because of the Commission's use of Plaintiff's liberty as extortionate leverage.

48. The Defendants knew that Plaintiff's conviction was wrongful and that the corrupt civil judgment was wrongful and issued by a corrupt judge who was biased against Plaintiff for not paying him the bribe he demanded. Yet, the Defendants used the wrongful criminal judgment and the wrongful and corrupt civil judgment to imprison Plaintiff for four years out of retaliation, spite, and outrage that he would not falsely confess to a crime he did not commit.

49. The Defendants have conspired to coverup their wrongdoing up until the date of the filing of this Complaint, and have refused to respond to any of his many letters seeking redress or to meet with Plaintiff to resolve this issues herein. This coverup is part of an ongoing and unbroken 27-year conspiracy to violate Plaintiff's rights.

50. In these many letters to several of the Defendants, Plaintiff has set forth the 2019 confession by Indiana State Police Detective Brooke Appleby to Pulitzer Prize winning journalist Dan Luzadder that he corrupted Plaintiff's criminal trial to such a degree that it was wrongful, unfair, and unconstitutional  In addition to the confession of Detective Brooke Appleby, journalist Luzadder has interviewed other officials in Indiana who confirmed that Plaintiff was wrongfully convicted.  This information is so powerful that a Hollywood film director, Mike James, has joined

forces with Mr. Luzadder and an Emmy-winning Austin-based film company to create a ten-part cable TV series about Plaintiff's wrongful conviction and the corruption of DOJ officials, including those involved in Plaintiff's wrongful parole revocation. The series will focus in part on the corruption of the Indianapolis FBI field office which was under DOJ and Congressional investigation at the time of Plaintiff's arrest by the FBI. That field office was considered "the most corrupt" field office in the country, a title it continues to hold to this day as found by the Office of Inspector General's recent report on how it corruptly handled the Larry Nassar Olympic gymnasts' case. https://oig.justice.gov/news/doj-oig-releases-report-investigation-and-review-fbis-handling-allegations-sexual-abuse-former  The cable series will also focus on how DOJ officials engaged in corruption and then covered up the corruption in Plaintiff's case and how DOJ officials, including the Defendants involved with Plaintiff's parole revocation, retaliated against Plaintiff and refused to respond to Plaintiff's protestations of innocence but instead abused the justice system by trying to coerce him into making a false confession and, when he maintained his innocence, brutally punished him with a wrongful parole revocation.

**Claims**

51. For the following claims, Plaintiff adopts the information set forth in paragraphs 1-50 above.

## Count I
## VIOLATION OF FIRST AMENDMENT RIGHTS

52. Defendants Tamera Fine, Lynn Battaglia, Renata Ramsburg, Parole Commission, Department of Justice, Merrick Garland, Erek Barron, and United States Attorneys Office violated Plaintiff's First Amendment rights to speech, political activity, and redress by retaliating against him for the exercise of those rights.

## Count II
## VIOLATION OF DUE PROCESS RIGHTS

53. The Defendants named in paragraph 47 above violated Plaintiff's due process rights by falsely accusing him of crimes, lying about those crimes to effectuate a wrongful parole violation, and refusing to correct their lies and misconduct at any time. Defendants Tamera Fine and Lynn Battaglia violated Plaintiff's due process rights by intentionally interfering with Plaintiff's bankruptcy and parole proceedings while using the parole proceedings to intimidate and retaliate against Plaintiff.

## Count III
## VIOLATION OF CRUEL AND UNUSUAL PUNISHMENT

54. The Defendants named in paragraph 47 above subjected Plaintiff to extended and pervasive cruel and unusual punishment by tormenting him with false allegations of crimes, repeatedly changing the goal posts, using extortionate tactics and unfulfilled promises, and placing him in an unsafe prison environment where he was subjected to repeated strip searches, unwarranted confinements in solitary and

dry cells, unwanted and nonconsensual fondling, digital penetrations, and sexual assault, left naked for extended periods, and threatened to falsely accuse his Unit Manager of sexual assaults against Plaintiff or never get out of prison alive.

## Count IV
## CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS

55. The Defendants named in paragraph 47 above conspired with one another to violate Plaintiff's right to due process, speech, political activity, and redress, and to subject him to draconian cruel and unusual punishment as outlined in Counts I-III above, and coverup their misconduct over a period of 27 years.

## Count V
## FAILURE TO ACT, INTERVENE, AND PREVENT, AND CONSPIRACY TO COVERUP

56. The Defendants named in paragraph 47 above in conspiracy with one another failed to act to protect Plaintiff from lawlessness and misconduct, and to prevent that lawlessness, and failed to intervene when they became aware of the lawlessness, as alleged above and in Counts I-III, above, and covered up their misconduct both directly and through a 27 year conspiracy.

## Count VI
## DENIAL OF DUE PROCESS BY THE CONTINUED COVERUP OF OFFICIAL MISCONDUCT

57. The Defendants named in paragraph 47 above denied Plaintiff due process by engaging in a decades long coverup of their wrongdoing, refusing to respond to any of Plaintiff's complaints, and failing to hold anyone accountable for the misconduct. The

Defendants' actions were objectively unreasonable and were undertaken intentionally, with malice, and with reckless disregard for Plaintiff's due process rights.

### Count VII
### SEXUAL ASSAULT AND ABUSE UNDER FEDERAL AND STATE LAW

58.. The Defendants named in paragraph 47 intentionally revoked Plaintiff's parole on trumped up charges and conspired to have him transferred to an unsafe prison where they knew he would likely be subjected to sexual abuse and he was. This caused him severe psychological trauma and PTSD which is actionable under both federal and state law.

**Remedy**

Plaintiff seeks a declaratory judgment against the Defendants finding that they violated Plaintiff's rights as alleged in Counts I-VII. Plaintiff seeks $12,000,000 in compensatory damages from Defendants and punitive damages in an amount determined by a jury.

**Jury Demand**

Plaintiff demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

Brett Kimberlin
8100 Beech Tree Road
Bethesda, MD 20817
(301) 320-5921

August 6, 2024